314-0720 People of the State of Illinois, Appalachia, by Thomas Morato v. Nathan Leuthold, Appalachia, by Barry Smedek You may proceed Good morning, Your Honors. Good morning, Counsel. Judges, certain things we know. We know that a woman, Mrs. Parrish, was riding in a car driven by her husband, and she saw a man walking down the street on the driver's side, and that Dr. Parrish, her husband, who was driving, told her he thought the man was African American. We know that he was wearing a black hoodie pulled down over his head, and that he was looking down, and she could only see his cheek and his jawline, she said. She described the black pullover as without a drawstring and without a zipper, and police would later find a black hoodie in Nathan Leuthold's bedroom that didn't have a zipper or a drawstring. Was it the same hoodie? Well, the hoodie that was found in Nathan Leuthold's room apparently had writing on the front of it, and she didn't identify any hoodie with writing on it. When she passed a parking lot where the police believed that Nathan Leuthold had parked his car, she didn't identify any car as a car that she recognized as being a car she'd seen at the Leuthold home, actually where his wife and he were living. As an aside, Judge, and I was present for the earlier argument, I was going to mention that the Illinois Supreme Court recently decided a case called Lerma. It really doesn't apply to our case. The reason I mention it is that that case had to do with whether there could be expert eyewitness testimony, expert testimony with respect to the fallacy of eyewitness identifications, whether you could present expert testimony. Not an issue in our case, but it is a recognition of the fact that eyewitness testimony can be the cause of more false identifications than almost any other kind of testimony, and it is also interesting that in Lerma the identification also involves some... There was no eyewitness to the murder in this case. Pardon me? There was no eyewitness. No, there was not, Your Honor. But I'm talking about whether this... We're really limited on time, so let's focus on what this case is. Okay. Well, then what else do we know? We know that at 12.20 p.m. on February 14th she saw a man walking down the road and that between 12.30 and 12.47 another woman saying at about 12.40 she heard a gunshot from the house down the street. And we also know that at 12.45 p.m. Nathan Leuthold was in a Starbucks. The evidence was also that it took seven to eight minutes to travel from the Newton home to a park to get to that Starbucks. It was physically impossible for Nathan Leuthold to be the person who was walking down the street who fired a gunshot at that time and was in the Starbucks at 12.45. It was a physical impossibility. That's why the State had to rely on other things in order to get this conviction. It had to rely on things, you know, the wrenching letter from the decedent, an affair allegedly with a foreign exchange student, and to bring in improper and prejudicial testimony that should never have been brought into this case. For instance, in closing argument the State made an indirect comment on the defendant's failure to testify, a comment made more prejudicial by the fact it proceeded from a perversion of the evidence. And speaking of the fact that the State introduced forensic evidence, that DNA was found on the gearshift of the decedent's car, and that Nathan Leuthold's DNA could not be excluded. In other words, not that his DNA matched the DNA on the gearshift, but that his DNA could not be excluded. Now, that in and of itself, I think, is proper evidence. And had the State, the State was entitled to introduce it, and had they done that and stopped there, it would have been proper, but the State went too far. Was there an objection during closing argument? No, there wasn't, Your Honor. So how are you framing this issue, which is Issue 10? It would have to be plain error, Your Honor. And how did that statement make a difference? It made a difference because it was a comment on the fact that Nathan, it was an improper comment indicating that Nathan Leuthold was, in fact, in the car, because it falsely indicated, suggested that it was his DNA, and pointed out the fact that Nathan Leuthold didn't testify because what the State argued was there is absolutely no other explanation as to why he would not be excluded, why his DNA would not be excluded on the gearshift. No explanation. The State said it twice. The only explanation is because he drove the car away from the house that day after he murdered Denise, and then said, so how is it that if he doesn't drive that car, if he hadn't driven it in years, how is he not excluded? How is that possible? That's a comment on the fact that he didn't testify, because the only person who could testify as to why he wasn't excluded would have been Nathan Leuthold. But during his videotaped interview with the police station, he indicated that he drove the car for oil changes. Right. So the jury had that. The jury had that, but what this was indicating was that he had driven the car that day. That was the difference with respect to it. So you mean the comment at closing was that he had driven it that day? No, that was what the government, the State was suggesting all along, that what happened is he had murdered his wife and then drove the car. You're back to this DNA on a car that's commonly owned by this couple. Right. Okay. And the suggestion in closing argument, yes, I'm sorry, Judge, yes. The comment is that his DNA is on the car shift. You don't need testimony from the defendant or an attorney, skilled attorney, to say, so what? It's a commonly owned car. You've got evidence in there that it is. You've got the video introduced, right? Judge, there's expert testimony. It's in evidence, the fact that it doesn't necessarily mean that it's him. But what the State is arguing is, in fact, and it should have been objected to, is that there's no explanation as to why he's not excluded. And that is suggesting that the defendant would have had to come up and say, this is why my DNA was not excluded. I think it's definitely indicating to the jury that the defendant has, that it is his DNA on the car, and that he should have to explain why his DNA is on the gear shift. So I disagree, Judge. I think it is, it is an indication and a comment on his failure to testify. And it's interesting because, you know, as another aside to this, you know, the State basically indicated almost that because it was not excluded, the State argued as though it meant it was conclusive. That was really the point of the State's argument, even though it wasn't conclusive. And it's interesting because the defendant was not allowed to present evidence of other acts where someone else might have committed the crime because he couldn't match it up in so-called fours. And in this particular case, the State... But the defendant made an offer of proof in front of the judge. Yes. This is your Issue 11. Yes. And the judge said, not close enough. Not close enough. So we review that for an abuse of discretion. How is that really an abuse of discretion based on the offer of proof? Because there was sufficient evidence to show... The judge was not focusing on what the main point of that offer of evidence was, which was the fact that someone had broken into a home, had used the victim's car in order to drive away. That burglary was not during the day, though. It was not during the day. It was at night. No one was killed. And it was in, like, another part of town. I'm not familiar with the area, but it wasn't in the exact area. The jury could have decided that. It wasn't on all fours, just like the D&A evidence wasn't complete, you know, shouldn't have been talked about as though it was conclusive, but that was admitted into evidence. I'm just contrasting the fact that in this case, maybe with respect to the other acts, it wasn't completely on all fours, but it was something the jury was entitled to know. Similar to the first area that I was talking about with respect to the D&A, was the argument, and again it's in closing argument, where the state argued what person would take his children's funds to hire a lawyer to silence his lover from talking to the police. Those are the first words the state said to begin its closing argument. It framed the argument that followed. It was nearly to me as prejudicial as if the state had commented directly on Nathan's own invocation of the Fifth Amendment. The notion that he hire a lawyer- Wait, wait, wait. Did he invoke the Fifth Amendment? No. Nathan didn't testify. I'm saying, if I'm comparing it, this is not Nathan taking the Fifth Amendment. What was said was that Ina Dobalate took the Fifth Amendment, not Nathan. But what the state argued was that Nathan hired a lawyer in order to silence her. Was that true? He hired a lawyer. He did hire a lawyer. And isn't it a fair comment on that evidence? No. Can't the state argue inferentially that there was a reason he did that? No, Judge. I think that is an improper inference to argue. Why didn't she hire her own attorney? Pardon me? Why didn't she hire? Maybe she couldn't afford an attorney. Maybe if the state thought there was a conflict of interest with her having an attorney that was hired by Nathan, maybe the state or someone should have suggested or had her get another lawyer. Was this issue preserved in the post-trial motion for a new trial? Judge, no. And was there an objection during the closing argument? No, there wasn't, Judge. Again, it has to be plain error. Judge, it is a real thing. How would that be plain error? Because, again, because it is an improper argument, Your Honor, because it's suggesting that he is in a conspiracy with Ina and that he is hiring someone to keep her quiet. And I think that is very close to almost commenting on that fact that he's keeping quiet. There's a lot of text messages that were deleted by both of them. Yes, Your Honor. So it seems to me that the prosecutor's argument, if you think it was asserting a conspiracy, is also founded on fact in the record and inference from those facts. Judge, but a person has a right to take the Fifth Amendment, and Ina Dobolate had a good reason. If I was her lawyer, I would have suggested she take the Fifth Amendment. Did she take the Fifth Amendment? Apparently so, because she was immunized. And the fact that she was immunized indicates that the state thought that she did have exposure. So the lawyer did the right thing in having her take the Fifth Amendment. And I think it was an improper comment to suggest that a lawyer, a separate lawyer, not Nathan Leuvel's lawyer, represented her, made the determination that what was best for her was to stand on her Fifth Amendment rights, and that's what she did. And after she was immunized, she testified. I don't think it was proper to suggest that any conclusion or presumption could be brought from the fact that she decided to take the Fifth Amendment. And I think that's entirely inappropriate, and certainly inappropriate to suggest that Nathan had something to do with her taking the Fifth Amendment, that he was trying to keep her quiet. There's no evidence with respect to that. It's a completely improper argument. And it goes against the reason for the fact that people take the Fifth Amendment, and it's not meant to be, to presume anything from someone taking it. In fact, Judge, the inference that you're drawing, I think, is the very inference that I think is improper, with all due respect, Your Honor. The fact that the inference, and at this stage argue that it's reasonable that he was hoping that hiring a lawyer for INA would prevent her from testifying, I think that's entirely improper, because I don't think that's an inference that you could draw from that. The only inference you could draw from it is the fact that she could have been implicated in this based on all those text messages and everything else in some way, and she was entitled to a lawyer. Unlike many members of the general public, we understand that invoking the Fifth Amendment does not indicate guilt. But I think the general public and a juror would think that it does indicate something is wrong. The State could have asked for an independent lawyer to be hired to represent her, an advisor. It didn't. The State said it was only one comment in a lengthy argument. Maybe it was, but it was a prominent argument. It was the very first thing that the State said when it started its closing argument, and I think it was designed to jar the jury, and it probably did. Your Honors, this was a case that made for a great made-for-TV movie. It proceeded from an unsupported assumption that Nathan would rather commit murder than get a divorce. A movie isn't reality, and we believe the defendant's conviction should be reversed. Thank you, Your Honor. So you've discussed Issues 9, 10, and 11. Are there any other? And 1. And 1. I stand on a brief on the other issues, Judge. I'd like to speak to the search warrant that was not discussed on Issue 7. Is that the second, what I refer to as the second search? No. Oh, I'm sorry. It was the deep search into the computer. Issue 7. Yes. Why didn't you disclose that in your brief? Because we read the briefs before we read the record, and I'm just wondering why you omitted that. I apologize, Judge. Actually, when the State had pointed it out, I had overlooked it. When you look at, I think, the judge's decision on the matter with respect to the search, I think, and I hope I'm right about this, I'm going from memory, he mostly does it on the consent issue, and then he also says that there was a search warrant. It was, frankly, Judge, an oversight on my part. I appreciate that. I'm sorry, Your Honor. I appreciate that because the judge's ruling does both mention consent, and that's at page C245 in the record. It's so important. Yes, and he does say- It's important for these cases that we can rely on the attorneys to accurately represent the record, and if counsel hadn't been on his toes, he might have slipped right by us. I know, Your Honor. I appreciate that. My reputation is behind these things. I appreciate your comment. Thank you, Judge. May it please the Court. Good morning, Your Honor. Counsel. I guess I will start with the last argument and move up. The comment regarding the hiring of the lawyer for Ina DuPonte was, I think I'm saying that correctly, was a proper and fair comment. I mean, the general emphasis of this was that they were having an affair, and if you look at the telephone conversations as well that occurred between an offendant in the jail and he's clearly directing her about things that she should be thinking about and saying, and this is what's going to happen. So when he directs, presumably his father takes money out of one account, puts it into Anna's account and replaces it with money from the account for Denise Lutel's children. That's simply set aside. So it's a reasonable inference to say that he is paying for this lawyer, and Anna was invoking the Fifth Amendment, and it was only until she was presented with the immunity that she was going to then testify. Okay. When was she presented with immunity? Before the trial? Yes, before the trial. I would point to People v. Hamilton as a case that the defendant cites to and says, well, this is relevant to show that it's improper to comment on the silence of a witness. Except if you go to the end, towards the end of the case, they say, moreover, the witness did testify of being granted immunity. Consequently, no impermissible inferences could be drawn because the witness was not subject to cross-examination. That's exactly what happened in this case. Anna was granted immunity. That was disclosed to the jury. There was evidence presented to the jury about these financial transactions for Anna. Therefore, this is all reasonable. Did that evidence come in without objection? Yes. Did the defendant do a motion in limine prior to trial to keep that evidence out? I don't recall that, Your Honor. But it certainly wasn't in the post-trial motion. So I have a question here, and maybe you can help me with this. It's always troubling. So the state has in their list of people who will testify someone that they have granted immunity to, and they're going to testify on behalf of the people. Correct. What's the necessity in this opening argument of talking about how they got there? I mean, what's the purpose of that? The purpose is to show the defendant's guilt, the inference of the defendant's guilt. No, isn't that what you do with putting on evidence? Well, I mean, we're in the argument stage. So we're trying to persuade the jury that all of this evidence, you can infer from it that the defendant is guilty. And that's just one piece of the evidence. I mean, the counsel talked about tertiary. So if there had been a grant of immunity, and she was going to be subpoenaed to testify, and she's represented by counsel and invokes her Fifth Amendment, can you comment on that? No. But that's not what happened. I'm not so sure. Opposing counsel thinks that's what happened. I mean, that is argument. Well, except Hamilton speaks exactly the opposite of what his argument is. And that's the case. He relies upon so much. So as long as immunity is granted, you get a chance to cross the exam. It doesn't matter. Exactly. All right. The. Moving up to the second, the comment regarding the DNA evidence. I pointed out in the brief the comments that were before the complaint of comments, that the state acknowledged that there were, that was, could not be excluded, that there is, that the evidence was, that there was, that she says you cannot make a match because you don't have the entire set of DNA. So how is it if he doesn't drive that car? He hasn't driven that car in a year. How is it not excluded? That's argument. Now, she played for the jury the hard portion of the tape videotape recording. That's where he said, I haven't given it a year. So it's not a comment upon his silence. It's a comment upon the explanation that he gave to the police. So that's a fair comment. Going up to the other acts. The other accident. First off, I would suggest the honor that there was not a appropriate offer of proof. It was just a summary. Correct. It was informal. But it was didn't fall within the categories. I believe Roberson is that says these are the things that you have to have for a proper offer of proof. So I don't think it's properly preserved. Also, the could have presented a formal offer of proof because the guy with the witness was right there. But he didn't do it. So I think it was not proper for this court to even consider it. Also, it's not an abuse of discretion. If you could consider it because those alleged crimes. And it was funded by the state's attorney about what the details of the crime that they were at night. This didn't happen at night. No forced entry. This was a forced entry break, breaking into class, different part of town. And the victims were tied up with duct tape security. That's one of the incidents what happened in this case. So it was proper. It was no abuse of discretion. No other judge in that situation. The finally, as far as the evidence pointed out a couple of things about Parish's testimony and the other testimony about the gunshot. Is there a perfect fit with the timeline? Perhaps not. But on the other hand, that is all just pieces of the evidence that this jury, as a trier of fact, gets to sort through. They get to decide conflicts of the evidence. They get to decide whether the evidence is at the credibility of the witnesses. When you look at the additional evidence that was presented, you have the confession to David Smith. That the inmate who wrote down his notes. Now there was an argument that, well, he talked to the cops at some point. The only evidence that he talked to the cops was when he talked about that note about the items that were taken from the house. Everything else appears to have happened beforehand. All the notes that he took, all the discussions was before he went to the police. So there's no that evidence was pretty detailed. The shot to the left side of the head. Supported by the autopsy said that he met somebody on our lineup. Describe black clothes, black clothes, which Diana Parrish identified as a hoodie with no strings. Black was such a thing was recovered with his DNA. Don't stop. Right. Please. The DNA was defended. I've been initially poisoned. This is David Smith. Initially poisoned the victim with insulin or potassium. Decided to use a gun to have research silencer for a clock. That is evidence that I don't think would be in Iran to discuss the newspaper articles, which I don't. But when it's been in the ovens. But if you look at the right top searches. Hey, guess what? We have how to silence a glock. Lethal injection, murder, insulin, non-diabetic getting insulin shots, sleep inducing drugs, sleep inducing knockout, et cetera, et cetera. It's on the record. I mean, then you have the other testimony regarding. It's kind of had a lot. Well, it killed that killed. Denise was fired from a block. You have all the conversations that in the text messages clearly show that they were in a romantic sexual relationship. Spending Europe, some was in Europe. So it's been nights or spending time in hotels and in apartments. I mean, it's clear motivation set up by all this evidence. So I think all this evidence taken together is more than sufficient. And any of the other things that are complained of in this are either harmless or not prejudicial. I also point out that there was no substantive analysis of planar analysis presented. I just thought this is planar. I think you have to do something more than that. If there's no other questions, we respectfully ask that this court. Thank you. Thank you. Just a few comments, Judge. With respect to the issue of immunity, the issue is, I think, really the fact that the state argument was the fact that he got a lawyer to silence her. That's what I think is really the improper argument there, that he got a lawyer to silence her, as opposed to getting someone a lawyer for a very good reason. The person should probably have a lawyer, given what's going on in the case. But there are multiple inferences you can draw from a certain fact. Yes, but I'm sorry, Judge. Isn't that right? Yes, there are. But I don't think the one that should be drawn is one that basically starts getting close to like a Fifth Amendment sort of thing. It's the inference that we're not supposed to be able to draw when it's the defendant, that somebody is guilty because they are lawyered up or because they decided to take the Fifth Amendment. It's an extension of that. I realize it's not the same thing, but it's still arguing the fact that somebody who's taking the Fifth or somebody who gets a lawyer for somebody is trying to silence that person. And I think that's a wholly improper argument to make. Well, they're trying to influence that person is the argument. But I think that's an unfair argument because everyone is entitled to a lawyer. And I think it is an unfair argument to suggest telling someone you should have a lawyer, go talk to your lawyer, that that is an indication that that person is trying to influence that lawyer, trying to get that lawyer to do something, trying to get somebody to not testify or something like that. I think that's an improper inference that shouldn't be argued. I'm not saying a juror is not going to like think that to him or herself, but I think it's improper for the State to make that argument. Was it an argument or was it simply a question that they posed? It was a question that they posed. And it was followed by three additional questions. Yes, but it was. It was the opening statement, I think, in the closing argument. What person would take his children's phones to hire a lawyer to silence his lover from talking to the police? What person would murder his wife as a Valentine's present for his lover? What person would calculate the perfect time to execute his wife? And that's all based on the record. This happened on Valentine's Day. It happened during a very short window of time during the week when the wife was alone. What person would search the Internet, find out how to silence a Glock, suppress the sound of a gunshot? And those are appropriate arguments, but not that he hired a lawyer. Okay, so one of the questions out of four was improper. The first one, yes, but it was the opening question. Okay, and then she did not follow up on, or he, it was Mr. Brady that made the closing argument at that point. He didn't follow up on that. He didn't develop that argument. He judged, I think, but it was a jarring opening statement for the closing argument. All right. Because of that single question, you are asking us to set aside the conviction based on prosecutorial misconduct during closing argument. Is that? That is part of it, yes, Judge. I think that the evidence itself was questionable with respect to, you know, when we talk about, you know, the counsel talks about it wasn't a perfect fit of the timeline. No, it was a physically impossible timeline, and therefore the jury had to rely on other things in order to support the notion that Nathan Luthold committed this crime. And I think statements like that, like the fact that he apparently hired a lawyer to silence his lover, the person who was allegedly his co-conspirator in some ways, I think that it may be just once, but I think that is a very glaring comment. And I think put that together with what I also talked about with the DNA evidence, with the argument that he wasn't excluded, the DNA on the gear shift, is another thing that those things in combination could have caused the jury to overlook the fact that, in fact, the timeline made it physically impossible for him to have committed this crime. What they also did, of course, and counsel, it was a big deal in the trial, is the sexual relationship. You know, that allegedly there was this sexual relationship between him and Ina Dovalate, and that somehow this, yeah, they dirtied him up in order to make him seem guilty. Unfortunately, you know, and the juror probably, well not, didn't like him or something. But that doesn't go to show that he committed the crime. What did it do? Well, didn't the state operate with a lot of restraint? I mean, with regard to the computer evidence, Mr. Toner says, you know, we're going to let it all in. Everything you found on the computer can come in. But the state really operated with some restraint and didn't admit any of the pornographic searches that your client had conducted. But Judge, I think, I'm thinking, hoping that that's one place where we would agree on that probably if they put in pornographic things from a computer, if there were any, that would be error. Whether it would be reversible, I don't know, but that would certainly be error. Mr. Toner stipulated that it ought to come in, and it was a matter of trial strategy. But yet the state didn't take the bait. So I think the state operated with a lot of restraint here. Your difficulty is you can't make the facts go away. Judge, but the one thing that the state can't make go away is the fact that the timeline is, it would be impossible for this person to have committed the crime. I agree. There's a conflict in the timeline because your client had receipts, and they were seen on videotapes. Right. Which conflicted with the neutral witness's recollection of when she heard the gunshot as she was driving around the neighborhood. Isn't it possible that she was mistaken? Well, the reason, I'm sorry, Judge. And that's what the jury has to be saying. Well, the reason I think she wouldn't be mistaken is because that was one of those things that was definite because she knew the time that she had sent a text message to someone, it was 1247. So we had that time. And she said she arrived at 1230, and it was midway between when she heard, midway between arriving and 1247 that she heard the gunshot. She had testified that it was 1240-ish, and the state knew that that was a problem because they kept trying to push it back in closing argument and in questions, I think, to the police officer to try to make it 1230. But, in fact, it wasn't 1230. It was 1240-ish. That's what she testified to, and she could base it on the fact that at 1247 she had sent a text message to someone. And the state can't... I think it was, Judge. They say she dropped off the stuff. So, I mean, that is a big problem because it was just physically impossible for him to be the one. And the other thing that's clear is he was on the surveillance camera at the Starbucks at 1245. So those times, you know, at least at 1245, 1247, are pretty solid. Prior to that, when was he last seen? Well, if you're talking about when the person saw someone walking there at 1220, well, as far as Nathan, I... His documentation of where he was with the receipts. I don't recall, Judge. Yeah, it is in the record. I don't recall where it was. I would just mention, you know, with respect to David Smith, you know, my only argument is that, you know, he could have gotten his information anywhere, and not everything was correct. I think David Smith, as I recall, said that Nathan told him that he hid in a closet or something like that and waited for her, and I don't think there was a closet, and I don't think that's how the murder happened. I think it was just behind a door. So he didn't get everything right, and there's no telling where he would have gotten his information from. Thank you very much, Your Honors. Thank you. Thank you, Counsel. The Court will take this matter under advisement and render a decision with respect to it. We will now take a break for panel discussion.